# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHARLES MRLACK, JR., | ) |
| | ) Civil Action No. 17-1211 |
| Plaintiff, | ) |
| | ) |
| v. | ) Magistrate Judge Lisa Pupo Lenihan |
| | ) |
| CALIFORNIA UNIVERSITY OF | ) |
| PENNSYLVANIA, CALIFORNIA | ) ECF Nos. 64, 70, & 74 |
| BOROUGH, DONALD GETTIG, | ) |
| TOM MCCARTHY, ALYSSA | ) |
| BROWN, DANIEL STURM, | ) |
| STEVEN ORBIN, RICK ENCAPERA, | ) |
| and EDWARD MCSHEFERY, | ) |
| | ) |
| Defendants. | ) |

## **MEMORANDUM OPINION**

Presently before the Court are the Motions for Summary Judgment filed by Defendants Alyssa Brown (ECF No. 64), Tom McCarthy (ECF No. 70), and Defendants Donald Gettig, Edward McShefery, Steven Orbin, and Daniel Sturm (ECF No. 74). For the reasons discussed below, the Motions will be granted. The dismissal of the fabrication of evidence and conspiracy to fabricate evidence claims pursuant to *Heck v. Humphrey* is without prejudice.

This civil rights case concerns the actions of police officers surrounding Plaintiff's arrest just before 10:00 p.m. at the California University Convocation Center; Plaintiff's subsequent injury when he fell off a bench in a holding cell at the site of the arrest; and the promptness of Plaintiff's medical treatment thereafter.

I.  FACTS

The following facts are undisputed unless otherwise indicated and are taken from the parties' Concise Statements of Material Facts, Responses thereto, and accompanying Appendices at ECF Nos. 66, 67, 71, 72, 76, 77, 82, 83, 84, 88, 91, 94 & 98.

On September 15, 2015, Plaintiff entered the California University ("Cal U") Convocation Center to attend a boxing match. (ECF Nos. 82, 94 & 98 ¶ 1.) Plaintiff states that he arrived at the Convocation Center after meeting his wife at a "local establishment" where he had one Stella beer. He states that he did not have any other alcoholic beverages thereafter, including when he was at the Convocation Center, and that he was not drunk that evening. (ECF Nos. 82, 94 & 98 ¶¶ 2-3 & 11-12.)

Record documentary evidence refutes Plaintiff's assertions that he was not intoxicated that evening. First, Lab Results from Monongahela Valley Hospital reflect that Plaintiff's blood alcohol level from a sample taken later that evening was .192. (ECF No. 72-12 at 3.) In addition, a report generated by Convocation Center on-site emergency medical responders indicates the following in relevant part: "PT[patient] was obviously intoxicated and was screaming at myself in foul and degrading language. PT was asked to be let to die. PT also kept screaming at me that 'Karma is a bitch and it will get pretty boy. If Karma don't I will.'" (ECF No. 72-11 at 9.) The report also states that "Patient admits to alcohol use, smell of alcohol on breath." (*Id.*) That report further indicates responders were "at patient" at 10:46 p.m. (*Id.* at 8.) Likewise, a report generated by emergency medical services arriving on scene at 10:56 p.m. reflects under "Injury Details": "alcohol" and that "patient admits to alcohol use." (*Id.* at 6.)

Upon arrival at the Convocation Center, Plaintiff noticed an acquaintance standing in line at the concession stand attempting to purchase beverages. (ECF Nos. 82, 94 & 98 ¶ 6.) Plaintiff

went to the front of the line to pay for his acquaintance's drinks because he wanted to return a favor, and in doing so, moved ahead of many other patrons in line. (ECF Nos. 82, 94 & 98 ¶ 7.) Plaintiff decided to also purchase beers for all the people he went in front of in the concession line. (ECF Nos. 82, 94 & 98 ¶ 8.) The parties dispute whether patrons may purchase more than two beers at the concession stand or whether they can only have (or carry) two of the beers they purchase, if purchasing more than two. (ECF Nos. 82, 94 & 98 ¶¶ 9-10.) In either event, the parties agree that the concession stand employee waived over Defendant Officer Gettig, who was assigned to patrol the event, for assistance. (ECF Nos. 71 & 91 ¶ 14; Plaintiff's Dep., ECF No. 72-4 at 18.)

Upon approaching Plaintiff, Officer Gettig told Plaintiff a couple of times that he should either leave the Convocation Center or go back to his seat. (ECF No. 72-4 at 18.) Plaintiff testified that he responded to Officer Gettig a couple of times, "Why would I do that?" and "What is the problem?" (ECF No. 72-4 at 18-19.) Officer Gettig told him to leave the line and proceeded to pull him out of the line using a "chicken wing" maneuver. (ECF Nos. 82, 94 & 98 ¶ 17.) Officer McCarthy then approached the concession stand. (ECF Nos. 82, 94 & 98 ¶ 19.)

The parties disagree as to what happened next. Plaintiff states that Defendant Officers McCarthy and Gettig grabbed Plaintiff and threw him into a wall, approximately five (5) steps from the concession stand. Plaintiff states that his head struck a pointed corner of the wall. The Defendant Officers instructed Plaintiff to stop resisting, even though Plaintiff asserts he did not resist. According to Plaintiff, the Officers then struck the back of his head with an elbow. The Officers then proceeded to slam Plaintiff to the ground, utilizing a leg sweep. Plaintiff stated that he bounced off the wall after his face struck a pointed corner of the wall. Plaintiff states that he

noticed some blood in the vending area where he was slammed into the wall and floor. (ECF No. 82 ¶¶ 20-26.)

Defendants assert that Plaintiff was intoxicated, belligerent, slurring his words, arguing with the concession stand worker, not leaving the line as requested, and not cooperating with their commands. Defendants assert that they took Plaintiff to the ground when Plaintiff resisted arrest by pulling away. Defendants further deny that Plaintiff's face struck a pointed corner of the wall and assets that he did not bounce off the wall. (ECF Nos. 94 & 98 ¶¶ 17, 18, 20, 21, 22, & 24.)

The concession stand employee, Jennifer Weld, was employed as a supervisor for AVI Fresh. She was working that evening at the lobby concession stand operated by AVI Fresh during the boxing event. (Declaration of J. Weld, ECF No. 72-6 at 2.) In her Declaration, she states that Plaintiff argued with her about his beer purchase and appeared intoxicated and slurred his words. (*Id.*) She made the decision not to serve him and advised Plaintiff of the same. She indicates he became upset and started yelling at her and causing a scene. She further states that a police officer located near the concession stand approached and asked him to return to his seat several times, but the Plaintiff continued to yell and make a scene. Then another police officer approached, and both officers tried to calm the Plaintiff and asked him several times to return to his seat, but he did not. (*Id.* at 3.) Attached to her Declaration are two statements given by Weld, one written the day after the incident and another written approximately two (2) weeks later. (*Id.* at 6-10.) Both statements indicate that even after Plaintiff was on the ground, he continued yelling and struggling with the Officers. (ECF No. 72-6 at 7 & 10.) Weld also states that she did not see any blood in the lobby area. (ECF No. 72-6 at 7.)

Defendant Officer Alyssa Brown arrived on the scene once Plaintiff was on the ground. (ECF Nos. 82, 94 & 98 ¶ 28.) Officer Brown assisted with the other Officers' attempts to handcuff Plaintiff. (ECF Nos. 82, 94 & 98 ¶ 31.)

Plaintiff states that while he was on the floor in the concession area, he felt the Defendant Officers strike his head, neck, and back with their knees and forearms. The Officers handcuffed him while he was on the floor. (ECF Nos. 82, 94 & 98 ¶¶ 29-30.) The parties dispute whether Plaintiff indicated that the handcuffs were "pretty tight" and whether he asked that they be loosened when Defendants first placed the handcuffs on him. (ECF Nos. 82, 94 & 98 ¶ 33.)

Record video evidence shows Officers attempting to control an individual who is resisting their efforts to handcuff him. It does not portray officers aggressively kneeing, elbowing or otherwise needlessly assaulting Plaintiff. (Cal U Surveillance Video, ECF No. 72-5; Bystander SnapChat Videos, ECF No. 72-10.) The video does not portray officers who are agitated or who have lost their tempers or who are maliciously or sadistically attacking Plaintiff.

Plaintiff was then picked up off the ground with the assistance of officers by his shoulder, lead down a hallway, and taken to a small holding cell containing a plank-like bench. (ECF Nos. 82, 94 & 98 ¶¶ 34-36.) The holding cell was made of brick and contained only one small viewing window. (Gettig Dep. ECF No. 72-2 at 12-13.) The parties dispute whether, at this time, Plaintiff begged the officers to loosen his cuffs. (ECF Nos. 82, 94 & 98 ¶¶ 37 & 40.) Plaintiff was shackled to the bench by one of his legs. (ECF Nos. 82, 94 & 98 ¶ 41.) The parties dispute whether Plaintiff complained about head pain prior to the head laceration he sustained after falling off the bench. (ECF Nos. 82, 94 & 98 ¶ 43.)

The parties agree that Plaintiff fell off the bench in the holding cell and lacerated his head. (ECF Nos. 82, 94 & 98 ¶ 46.) Plaintiff contends that he fell off the bench because he was

5

losing circulation in his arms due to the excessively tight handcuffs. Defendants contend that Plaintiff fell because he was drunk. (ECF Nos. 82, 94 & 98 ¶¶ 46-47.)

Plaintiff contends that when he was lying in a pool of his own blood, he had to plead for officers to call 911. Defendant Gettig states that when he heard a thump from the holding cell, he immediately looked in the holding cell window, saw the blood, and then immediately called for help. (ECF Nos. 82, 94 & 98 ¶ 48.) Specifically, Plaintiff testified that he pleaded for 911 to be called and indicated that after he told the officers he had never seen this much of his own blood, 911 was called. (Plaintiff's Dep., ECF No. 72-4 at 28.) Plaintiff could not estimate how much time elapsed from the time he requested that 911 be called and the time that the Defendant Officers called for medical assistance. (*Id.*) Plaintiff only stated that "it seemed like forever." (Id.) Emergency medical services records indicate that the onset of Plaintiff's injuries occurred at 10:42 p.m., and that first responders were on their way at 10:44 p.m. Plaintiff received treatment at 10:46 p.m. First responders wrapped Plaintiff's head in a bandage and the ambulance crew arrived at 10:56. (ECF No. 72-11 at 5-10.)

On November 16, 2015, Gettig filed a criminal complaint containing summary charges for disorderly conduct and public intoxication along with a grade two misdemeanor of resisting arrest. Plaintiff pleaded guilty to Public Drunkenness, 18 Pa. C.S.A. § 5505, and Disorderly Conduct for creating a hazardous or physically offensive condition, 18 Pa. C.S.A. § 5503 (A)(4). (ECF Nos. 82, 94 & 98 ¶¶ 63, 71.) The charge for resisting arrest was withdrawn as part of the plea agreement.

II.  LEGAL STANDARD

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, the pleadings, documents, electronically stored information, depositions, answers to

6

interrogatories and admissions on file, together with any affidavits or declarations, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a) & (c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact; that is, the movant must show that the evidence of record is insufficient to carry the non-movant's burden of proof. *Id*. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis added by *Matsushita* Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty-Lobby, Inc.*, 477 U.S. 242, 248 (1986). In *Anderson*, the United States Supreme Court noted the following:

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. . . . [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Id.* at 249-50 (internal citations omitted).

III.     ANALYSIS

Section 1983 of the Civil Rights Act provides as follows:

7

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. To state a claim for relief under this provision, a plaintiff must demonstrate that the conduct in the complaint was committed by a person or entity acting under color of state law and that such conduct deprived the plaintiff of rights, privileges or immunities secured by the Constitution or the laws of the United States. *Piecknick v. Commonwealth of Pennsylvania*, 36 F.3d 1250, 1255-56 (3d Cir. 1994). Section 1983 does not create rights; it simply provides a remedy for violations of those rights created by the United States Constitution or federal law. *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

### A. Excessive Force as to Defendants Gettig, McCarthy and Sturm

Defendants argue that their use of force was objectively reasonable as evidenced by the surveillance and Snapchat videos, other objective documentary evidence, and Plaintiff's own record admissions. Plaintiff responds that the videos do not blatantly contradict Plaintiff's version of events and disputed issues of material fact exist as to what Defendants faced when encountering Plaintiff, and whether Defendants' responses were objectively reasonable.

In order to state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, Plaintiff must show that a seizure occurred and that it was unreasonable. *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999). Here, the parties do not dispute that there was a seizure of Plaintiff. Consequently, the only issue before this Court on Defendants' Motions for Summary Judgment is whether the force used to effectuate the seizure was objectively reasonable.

8

Whether the use of force is objectively reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). In *Graham*, the United States Supreme Court cautioned that in applying the objective reasonableness test, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," will be deemed unreasonable. Instead, "[t]he calculus of reasonableness must embody allowance for the fact that 'police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.'" *Id.* at 396-97 (internal quotations and citation omitted). In addition, the United States Supreme Court has emphasized that each case alleging excessive force must be evaluated under the totality of circumstances. *Id.* at 397. *See also Kopec v. Tate*, 361 F.3d 772, 776-77 (3d Cir. 2004).

This Court is guided by the directive of the United States Supreme Court that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (relying on a videotape in assessing summary judgment evidence).

Here, objective video and documentary evidence, along with Plaintiff's own record admissions demonstrate that no reasonable jury could return a verdict in favor of Plaintiff on the claim of excessive force. First, the surveillance video shows that the officers did not use an unreasonable amount of force in dealing with Plaintiff. Plaintiff admitted that he would not

9

follow the officers' instructions to either return to his seat or leave the Convocation Center. When the officers attempted to place Plaintiff under arrest, the surveillance video shows Plaintiff pulling away from the officers and their need to use some force to effectuate Plaintiff's arrest. The video does not show the officers kneeing or elbowing the Plaintiff or in any way aggressively assaulting him. Instead, the officers appear on the surveillance and Snapchat videos to retain control of their tempers and to use only that amount of force necessary under the circumstances. Finally, objective documentary evidence reveals that Plaintiff's blood alcohol level was .192, that first responders reported that Plaintiff was obviously intoxicated, and that Plaintiff admitted to alcohol use.

Plaintiff has failed to raise an issue of material fact as to whether these Defendants used excessive force and Defendants Gettig, McCarthy, and Sturm are entitled to judgment as a matter of law on this claim.

    B.    <u>Excessively Tight Handcuffing as to Defendants Gettig, McCarthy, Brown and Sturm</u>

Defendants argue that they are entitled to judgment as a matter of law on Plaintiff's excessively tight handcuffing claim because 1) one of the officers did loosen one of the cuffs; 2) the first responder who treated Plaintiff while still handcuffed in the holding cell makes no mention in his notes of any pain, discomfort or other complaints relating to the handcuffs; 3) the ambulance crew transferring Plaintiff to the hospital while still in his cuffs makes no mention in their notes of any complaints by Plaintiff of pain or discomfort in his wrists, although they make note of his comments regarding money and beer; and 4) hospital medical records indicate that a musculoskeletal exam of Plaintiff's wrists was negative for any pain or swelling.

Officer McCarthy further argues that it was Officer Gettig who placed the handcuffs on Plaintiff and that Plaintiff admits that at no time did he complain that his handcuffs were too tight in Officer McCarthy's presence before he was placed in the holding cell.

Officer Brown directs the Court to the Snapchat video which reveals Officer Brown slightly and slowly pushing Plaintiff's arm down as another officer cuffs him.

In *Kopec*, the United States Court of Appeals for the Third Circuit held that excessively tight handcuffs will constitute excessive force in some cases, and that the right to be free from the use of excessive force in the course of handcuffing is clearly established. 361 F.3d at 777-78. In *Kopec*, the plaintiff was handcuffed and immediately lost feeling in his hand, fell to the ground, and begged the officer to loosen the handcuffs. *Id.* at 774. After ten minutes, as the plaintiff groaned in excruciating pain, the officer finally loosened the cuffs. *Id.* As a result, plaintiff suffered nerve damage that required several surgeries and for which a hand surgeon treated him for over one year. *Id.* The *Kopec* court cautioned that, although it found the plaintiff to be the victim of excessive force, the opinion "should not be overread as we do not intend to open the floodgates to a torrent of handcuff claims." *Id.*

Therefore, the Court is bound to construe *Kopec* narrowly. Here, Plaintiff has come forward with insufficient evidence to raise a material issue of fact as to whether he was handcuffed excessively and unreasonably tightly. Instead, the record reflects no evidence that Plaintiff sustained actual injury to his wrists. In addition, no record medical reports reveal complaints to medical personnel of wrist injury or pain, and no evidence of wrist swelling or pain. Under *Kopec*, the reasonableness of tight handcuffing does not raise a question of fact for the jury where the resulting injury is de minimus. 361 F.3d at 778 n.7 (collecting cases).

11

Therefore, Defendants are entitled to judgment as a matter of law on Plaintiff's claim for excessively tight handcuffing.

C. <u>Failure to Intervene or Render Aid as to Defendants Gettig, McCarthy, Brown and Sturm</u>

Defendants Gettig, Sturm and McCarthy argue that they are entitled to judgment as a matter of law on this claim because objective record evidence demonstrates that they did not engage in excessive force. Defendants direct the Court to the surveillance and Snapchat videos, and to the fact that Plaintiff plead guilty to the public drunkenness and disorderly conduct charges.

Officer Brown argues that she did not witness the initial scuffle between Plaintiff and Officers Gettig and McCarthy and so she did not have an opportunity to intervene at that point. Brown further argues that she did not intervene with the alleged excessively tight handcuffing because she did not hear Plaintiff complain that the cuffs were too tight. In addition, Brown argues that she was present only after the other officers had taken Plaintiff down to the floor. The surveillance and Snapchat videos do not show her engaging in any type of force against Plaintiff.

In order for liability to attach under § 1983 for failure to intervene in another's use of excessive force, a plaintiff must show that: (1) the defendant failed or refused to intervene when a constitutional violation took place in his or her presence or with his or her knowledge; and (2) there was "a realistic and reasonable opportunity to intervene." *Smith v. Mensinger*, 293 F.3d 641, 651 (3d Cir. 2002).

As discussed above at III. A. & B., *supra*, the Court finds as a matter of law that Defendants did not engage in excessive force when arresting Plaintiff or in regard to the handcuffing of Plaintiff. Because a constitutional violation did not take place in the presence of

12

these Defendants, they cannot be held liable for failure to intervene or render aid as a matter of law. Therefore, Defendants' Motion for Summary Judgment on this claim will be granted.

        D.        <u>Deliberate Indifference to Medical Needs as to Defendants Gettig, McCarthy, Brown and Sturm</u>

A pretrial detainee has Fourteenth Amendment protections under the Due Process Clause at least as great as those Eighth Amendment protections for convicted prisoners, regarding their right to receive adequate medical care. *Natale v. Camden Cnty. Corr. Facility,* 318 F.3d 575, 581 (3d Cir. 2003). In order to establish a cognizable claim for deliberate indifference to medical needs, plaintiffs must demonstrate that defendants were deliberately indifferent to their medical needs, and that those needs were serious. *Rouse v Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). The parties do not dispute that Plaintiff's medical needs were serious.

In *Farmer v. Brennan*, the United States Supreme Court clarified its meaning of the term "deliberate indifference." 511 U.S. 825 (1994). In *Farmer*, the Court held as follows:

> We hold instead that a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference . . . . But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Id*. at 837-38.

First, Plaintiff comes forward with no record evidence indicating that he had a serious medical need prior to being placed in the holding cell. Therefore, his argument that if he had been treated prior to being placed in the cell, his injuries inside the holding cell would not have occurred, raises no triable issue of fact. As to the time period just after his arrest but before he

was taken back to the holding cell, Plaintiff states only that he "noticed some blood while he was in the vending area." (ECF No. 82 ¶ 26.)

Defendants McCarthy and Brown advance similar arguments in support of their Motions for Summary Judgment. Both Defendants point to the absence of record evidence that they were in or near the Cal U holding cell at the time Plaintiff suffered his head laceration. In this way, they could not have been deliberately indifferent to his serious medical needs, because they were not aware of his needs.

Plaintiff testified that he could not identify the voices in the room adjacent to the holding cell that denied his request for medical care; he only indicated that if persons were in that room, then he heard their voice. (Plaintiff's Dep. ECF No. 72-4 at 28-29.) Plaintiff also testified that he saw Officer Brown in the office near the holding cell before entering it and when paramedics removed him from it after his head injury. After he lacerated his head and while he asked for help, he heard a female voice on the other side of the holding cell's wall, but admitted that he is only speculating that the female voice belonged to Officer Brown. (Plaintiff's Dep. ECF No. 72-4 at 48-49.) Officer Brown testified that she was not in the holding cell or the adjacent office at the time Plaintiff sustained the injury to his head. She testified that she did not go into the holding cell at all, and that she left the adjacent office area shortly after Lieutenant Orbin came in because "[h]e was displeased with my presence and told me to leave. So I left." (Brown Dep. ECF No. 72-3 at 7.) She further testified that she was not present at the time Officer Gettig heard the loud thug (*Id.*), and she was not present when the ambulance or emergency service providers attended to the Plaintiff. (*Id.*) Defendant McCarthy likewise testifies that he was in the hallway of the Convocation Center when Plaintiff fell from the bench, and only learned of his

injuries when he heard an ambulance request over the radio. (McCarthy Dep. ECF No. 72-1 at 9.)

Here, the Court is guided by the analysis of the United States Court of Appeals for the Third Circuit in *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 290-91 (3d Cir. 2018). There, the court was presented with the district court's grant of summary judgment on the issue of excessive force where one (1) of four (4) arresting officers kicked the plaintiff in the face, breaking his eye socket. *Id.* at 284. The defendants did not dispute that one of the officers kicked the plaintiff, but each of the four officers contended he neither inflicted the injury himself, nor saw the officer that did. *Id.* Plaintiff's face was pinned to the pavement when he sustained the blow and was unable to identify the perpetrator. *Id.* The district court, finding that a civil rights defendant must have personal involvement in the alleged wrongs, citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207-08 (3d Cir. 1988), granted summary judgment in favor of the defendants. *Id.* at 285. In affirming the district court on this issue, the court of appeals noted the following:

> [I]n the face of motion for summary judgment, a § 1983 plaintiff must produce evidence supporting each individual defendant's personal involvement in the alleged violation to bring that defendant to trial. But [plaintiff] has not done so: As he concedes, after significant discovery, he has narrowed the potential universe of actors to those that were in his immediate vicinity, but he filed suit against only four of the five of them and still cannot "identify the actor that kicked him." Put another way, he admittedly seeks to proceed to trial against at least three defendants who are "free of liability," without any "ascertainment of [which] individual charged was the perpetrator of the constitutional deprivation[.]" . . . [T]hat is not a sufficient basis to survive summary judgment.

*Jutrowski*, 904 F.3d at 291-92, 290-91 (internal citations omitted) (and discussing *Sharrar v. Felsing*, 128 F.3d 810 (3d Cir. 1997) (summary judgment affirmed where plaintiff could not identify which officer on the scene dislocated his shoulder when handcuffed) and contrasting

15

with *Smith v. Mensinger*, 293 F.3d 641 (3d Cir. 2002) (reversing grant of summary judgment where plaintiff could not see his five attackers but testified all were beating him; the extent of each officer's participation was question of fact for the jury.)).

Here, like *Jutrowski* and *Sharrar*, Plaintiff has failed to raise an issue of material fact as to whether Brown and McCarthy were in the office area near the holding cell when Plaintiff allegedly begged for medical assistance. The record reflects that he cannot identify them as being present at this time. Summary Judgment on this issue must be granted in their favor.

As to Defendants Gettig and Sturm, (and necessarily Brown and McCarthy), Plaintiff has failed to raise an issue of material fact that he bled in the holding cell for a prolonged period of time before receiving medical attention. Plaintiff testified in deposition that "[i]t seemed like forever," and "it seemed like a long time." (ECF No. 72-4 at 28.) Record surveillance video evidence shows Plaintiff being escorted to the holding cell at 10:00 p.m. A Supplemental Narrative prepared by Assistance Chief Michael Mile dated September 22, 2015 reflects that at 10:16 p.m., he was notified by cell phone to respond to the police office located inside the Convocation Center. Sometime after 10:16 p.m., he entered the police office and observed Plaintiff seated on the bench uninjured. (ECF No. 72-7 at 6.) Chief Mile further stated that he then spoke briefly with Officer Gettig and then with Lt. Orbin and Chief McShefery "(cell)" about Plaintiff's "disorderly actions." (*Id.*) Chief Mile indicated that he then returned to the Convocation arena when "shortly afterwards" he heard a call requesting the Chief to stop by the police office. He entered the police office with the Chief and there observed First Responder "John" tending to Plaintiff. (*Id.*) A Report generated by first responders located inside the Convocation Center places "onset" at 10:42 p.m. with arrival to the Plaintiff at 10:46 p.m. (ECF No. 67-5 at 4.)

16

In light of this documented timeline, and Plaintiff's inability to estimate the amount of time between his head injury and the time Defendants called for medical assistance, Plaintiff has failed to raise a genuine issue of material fact as to whether Defendants were deliberately indifferent to his serious medical needs. Moreover, Plaintiff has come forward with no evidence that any delay in his treatment exacerbated his injuries. Therefore, judgment as a matter of law is appropriate on this issue.

  E. <u>Civil Conspiracy and Fabrication of Evidence as to Defendants Gettig, McShefrey and Orbin</u>

Defendants Gettig, McShefrey and Orbin argue that because Plaintiff pled guilty to the state law charges of disorderly conduct and public drunkenness, Defendants are entitled to judgment as a matter of law for Plaintiff's § 1983 claims of fabrication of evidence and conspiracy to fabricate evidence under the *Heck* doctrine.

Plaintiff's responds that the *Heck* doctrine is inapplicable because his claims for fabrication of evidence and conspiracy to fabricate evidence are brought under the Fourteenth Amendment, and not the Fourth Amendment as in *Heck*, relating to a malicious prosecution claim.

Here, Plaintiff entered a plea agreement and pled guilty to Disorderly Conduct for creating a hazardous or physically offensive condition, 18 Pa. C.S.A. § 5503(a)(4), and to Public Drunkenness, 18, Pa. C.S.A § 5505. He asserts that he pled guilty to these charges "based on advice from his counsel that it was a summary offense that could ultimately be expunged from his record." (Plaintiff's CSMF, ECF No. 82 ¶ 72.) It appears that the Resisting Arrest Charge pursuant to 19 Pa. C.S.A. § 5104 was *nolle prosequied* as a result of Plaintiff's agreement to plead guilty to the summary offenses.

17

According to the doctrine first espoused in *Heck v Humphrey*, 512 U.S. 477 (1994), "a § 1983 action that impugns the validity of the plaintiff's underlying conviction cannot be maintained unless the conviction has been reversed on direct appeal or impaired by collateral proceedings." *Gilles v. Davis*, 427 F.3d 197, 208-09 (3d Cir. 2005). Thus, Plaintiff here must demonstrate that success on his § 1983 claims for fabrication of evidence and conspiracy to fabricate evidence would not conflict with the prior judicial resolution of his criminal proceedings.

The Court finds that Plaintiff's claims that these Defendants fabricated and conspired to fabricate evidence are barred by *Heck*. *See Floyd v. Attorney General of Pennsylvania*, 722 F. App'x 112, 77 (3d Cir. 2018). Plaintiff's success on those claims would necessarily imply the invalidity of his convictions. In order to make out a claim for fabrication of evidence, a plaintiff must show "a reasonable likelihood that, without the use of that evidence, the defendant would not have been convicted." *Halsey v. Pfeiffer*, 750 F.3d 273, 294 (3d Cir. 2014). In order to prevail on a § 1983 conspiracy to fabricate evidence, Plaintiff must prove that persons acting under color of state law "reached an understanding" to fabricate evidence against the Plaintiff. *See Jutrowski*, 904 F.3d at 293-94 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150-52 (1970)). Establishing these claims would necessarily imply that Plaintiff's convictions were invalid. *See Floyd*, 722 F. App'x at 77-78; *see also Long v. Atl. City Police Dep't*, 670 F.3d 436, 447 (3d Cir. 2012) (holding that *Heck* barred claims of conspiracy to obtain a conviction, including acts of fabricating evidence and perjury because Long's conviction had not been invalidated).

Therefore, the Court will grant Defendants' Motion for Summary Judgment on these claims because they are barred by *Heck*. Dismissal of Plaintiff's claims for fabrication of

18

evidence and conspiracy to fabricate evidence on *Heck* grounds is without prejudice. *See Curry v. Yachera*, 835 F.3d 373, 379 (3d Cir. 2016) (collecting cases).

F. <u>Qualified Immunity</u>

Defendants McCarthy and Brown raise the issue of qualified immunity. Because the Court has determined as a matter of law that Defendants have not violated Plaintiff's constitutional rights, the Court need not discuss the qualified immunity analysis further.

G. <u>Supplemental State Law Claims of Assault and Battery as to Defendants Gettig and McCarthy</u>

Plaintiff alleges state law claims of assault and battery as to Defendants Gettig and McCarthy. The Court, however, in its discretion, declines to exercise its supplemental jurisdiction over these state law claims pursuant to 28 U.S.C. § 1367(c)(3). These claims will be dismissed without prejudice to refiling the state law claims in state court.

IV. CONCLUSION

For the reasons discussed above, the Motions for Summary Judgment filed by Defendants Alyssa Brown (ECF No. 64), Tom McCarthy (ECF No. 70), and by Defendants Donald Gettig, Edward McShefery, Steven Orbin, and Daniel Sturm (ECF No. 74) will be granted. The dismissal of the fabrication of evidence and conspiracy to fabricate evidence claims pursuant to *Heck v. Humphrey* is without prejudice. An appropriate order will follow.

Dated: April 24, 2019

                                                            **BY THE COURT**

                                                            LISA PUPO LENIHAN
                                                            United States Magistrate Judge